IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES of AMERICA,

        v.                Case 1:20-cr- 10307 DJC

GUSTAVO KINRYS,
       Defendant.

## DEFENDANT'S REPLY MEMORANDUM

### Preliminary

Defendant, Gustavo Kinrys, by his counsel, Kevin L. Barron, respectfully offers this memorandum in reply to the government's May 31, 2024 sealed Sentencing Memorandum and its Motion for Restitution. Defendant does not file this memorandum under seal because it contains no information about victims, personally identifying information third-parties or other matters that need to be offered under seal.

### Introduction

There are substantial disagreements over incarceration and restitution to resolve at sentencing. Dr. Kinrys recommends a sentence of five years and restitution of $4,362.564.00. See, Defendant's Sealed Sentencing Memorandum and Memorandum in Opposition to Government's Motion for Restitution, Doc. 253. The government recommends a sentence of "135 months in prison, followed by three years of supervised release, restitution in the amount of $5,662,515.50" Government's Sealed Sentencing Memorandum, p. 2.

I. Government's "SUMMARY OF EVIDENCE"

The government states its loss calculations consistently with its Statement of Offense Conduct transmitted to Probation about the $19M face. Government's Sealed Sentencing Memorandum, pp. 1 - 8. Defendant argues that the correct measure of loss is the actual loss to carriers of $4.3M and that the intended loss is the amount of loss is defendant intended to inflict, which was the insurance carriers' contract price, $8,323,253.00. In summary, defendant's calculation of TMS loss actual loss should be reduced by the average contract amount paid of $233.00 per TMS session times the number of "tokens" used. The correct amount of fraud for face-to-face billing under CPT codes 90836 and 99214/99204 should be reduced because 18 sessions per day and not 12 were legitimate. See, Exs. A & B explaining defendant's calculations of adjustments to actual loss.

II. Government's GUIDELINES CALCULATION

"A.  The Loss Amount under U.S.S.G. 2B1.1(b)(1)(k) is Greater Than $9.5 million "

The government's argument for a loss amount of $19 million based on the gross face amount of the bills does not comport with the law and the facts shown at trial. Defendant estimates an overall "intended loss" of $8.3 million., below the $9.5 million threshold and a two-level reduction.

First, defendant has argued that this Court should side with courts taking the Third Circuit view in a conflict among the circuits that § 2B1.1 only punishes the loss to the victim, that the meaning of "loss" in § 2B1.1 is unambiguous and does not admit of the "agency interpretation" that loss includes intended loss. *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022), Defendant's Sentencing Memorandum, pp. 7 - 10. The government argues that the "law of the Circuit doctrine" as expressed in *Brill* precludes defendant's argument under the Third Circuit's decision

in *Banks*. See *United States v. Brill*, No. CR 20-10125-MLW (D. Mass. Sept. 13, *2021*) and *Banks, supra* ( § 2B1.1 not ambiguous because loss means loss and not intended loss). While this Court would wish to promote consistency in the rules of the District, *Brill* is not controlling. Even by its own terms, *Brill* says that the law of the circuit doctrine does not apply when "(2) 'authority that postdates the original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former [Circuit] panel, in light of fresh developments, would change its collective mind." *Brill, supra.* The subsequent conflict among the Circuits accepting or rejecting *Banks'* application of *Kisor* to intended loss is just such "an authority" that post-dates earlier First Circuit decisions upholding intended loss. Furthermore, the First Circuit had cause to address the issue in *Gadson*, a case in which defendant first argued *Banks* on appeal and not below; plain error analysis prevented the Court from deciding the issue on the merits. *United States v. Gadson,* 77 F.4th 16, 21 - 22 (1st Cir. 2023) ("With no binding precedent on his side, [he] cannot succeed on plain-error review unless he shows his theory is compelled by the guidelines' language itself.") Even though the Court of appeals noted it had clearly applied the "intended loss" doctrine in a long list of cases, it did *not* state that "intended loss" was the law of the Circuit. *Id.* at 22. (". . . our conclusion is not in direct tension with the Third Circuit's holding in *Banks*.")

      Secondly, the government argues under *Iwuala* and related First Circuit cases ruling that the face amount of a defendant's invoices is *prima facie* evidence of intended loss amount. Defendant has cited *Iwuala* for the proposition that the burden of production is on defendant to show evidence that defendant intended a lesser amount. Defendant has met that burden by showing that he regularly wrote off bills and that, as a matter of his long-standing policy antedating the offense conduct, he never sought to obtain further amounts than insurance contract

price.  It is not material that defendant may have later sued insurance companies after they had stopped payment on all of defendant's bills beginning in November 2017, where carriers refused to pay legitimate bills.

"B.   A 2-level Increase for a $1 million Loss to a Government Health Care Program is Appropriate. "

In this short section, the government argues that intended loss above the claimed $872,632.00 is approximately $3M and that defendant is therefore responsible for this two-level enhancement.  Defendant's above arguments about loss amount apply.  Actual loss is lower than the $1M threshold and the government has not advanced a specific amount of intended loss Medicare claims.  Thus, a reduction of actual loss to approximately $672,300, about 77% of the government's claimed actual loss is warranted, consistent with defendant's findings of the overall reduction in amount.   From counsel's review (which may be mistaken), the government has not shown sufficient support of its intended loss figure.

"C.   The Abuse of Position of Trust or Special Skill Enhancement under U.S.S.G. § 3B1.3"

Defendant has shown that he was in no more a position of trust nor did he exercise any degree of autonomy with *respect to the carriers or Medicare* than any number of fraudulent suppliers of goods.  The Court should vary from this enhancement.  Certainly, when a professional like a lawyer or a doctor commits fraud, it is a breach of his professional ethical rules.  But this does not justify an enhancement with respect to the carriers.  While there was a relationship of trust between doctor and patient, the opposite is true of doctors and insurance companies.  That relationship is one marked by mistrust.  Carriers like BCBS have well-staffed antifraud divisions to monitor doctors and suppliers of medical goods and services.  The carriers impose the recommendations of the CPT codes, apparently with little regard for the individual doctor's discretion, if the government's position is to be believed.

"D.   The Obstruction of Justice Enhancement under U.S.S.G. § 3C1.1"

Defendant has not objected to this enhancement.  He was convicted of obstruction.

"E.   The Vulnerable Victim Enhancement under U.S.S.G. § 3A1.1"

After carefully considering all the same arguments the government raises here and its objections to the PSR, Probation declines to apply the vulnerable victim enhancement. Defendant agrees with Probation.

Dr. Kinrys worked diligently for his patients and took good care of them.  The evidence from government witness, defendant's employees Zawadzka and Carvahlo, was that Dr. Kinrys was "very busy", even too busy seeing patients.  As Ania Zawadzka testified, "[i]n the beginning they were a little lighter, but I think towards the end they were quite busy, yes."  Tr. 4/84.  "I know that when Dr. Kinrys was in the office, he was very busy.  He had a full schedule."  Tr. 4/109.  Zaneta Carvalho even told Dr. Kinrys that he worked too hard, needed to slow down and to take a vacation.  "Q.  Now, there were times when you told Dr. Kinrys, Slow down, you're too busy, correct?  A. Yes."  See, Tr. 5/98.

The objective circumstances also show that Dr. Kinrys was diligent and worked hard seeing his patients.  Defendant disagrees with Probation's comment that defendant's conduct with his patients may be a factor in the offense even though not warranting application of the enhancement.  PSR p. 37, response to objections.  Defendant was on staff at MGH *for fifteen years* until he was charged.  He could not have treated his patients carelessly without escaping notice of referring fellow psychiatrists and his department superior.  Kinrys' referrals came through his department.  Kinrys, despite having committed a persistent significant fraud, was still a good and active clinician and researcher.  He didn't just treat patients; he attended to them with

outstanding care.  He also advanced the medical sciences.  See, e.g., Kinrys' publications listed on Google Scholar, Ex. C to this reply memorandum.

The government attempts to find support in the First Circuit's decision in *Cadden*, one of several New England Compounding cases in this District. In *Cadden*, hospital patients died of fungal meningitis from defendants' fungus-contaminated spinal infusions.  *United States v. Cadden,* 965 F.3d 1 (1st Cir. 2020).  The Court of Appeals found error in the trial court's ruling that only the purchasers of defendant's compounds were the "victims" for purposes of the §3A1.1(b)(1) vulnerable victim enhancement and that patients, injured or killed, could be included in the definition of victims.  *Id.* at 35.

That the end users of a contaminated compound are victims for §1B1.3 purposes is far from the issues of this case.  Here, the government attempts to argue that patients must receive 5 TMS treatments per week for six weeks according to clinical trials conducted in 2008.  See, Neurostar manual, Ex. 1, "Indications", pp. 12 & 14, notes discussing the clinical trials conducted in 2008.  Years of clinical use and subsequent studies have since shown that lower numbers of sessions are effective for some disorders.  See, e.g.,  Transcranial Magnetic Stimulation in Anxiety and Trauma-related Disorders: A Rystematic Review and Meta-Analysis, by Patricia Cirillo, Alexandra K. Gold, Antonio E. Nardi, Ana C. Ornelas, Andrew A. Nierenberg, Joan Camprodon, Gustavo Kinrys, May 7, 2019.[1]

The government cannot fairly argue that Dr. Kinrys' patients were harmed because they did not get adequate treatment due to the offense conduct.  The rules of criminal sentencing have not dispensed with showing causation *and* harm on a preponderance of the evidence.   The government has proven fraud and false statements in medical records, but the case did not

---

[1] https://onlinelibrary.wiley.com/doi/full/10.1002/brb3.1284

include any competent evidence that patients suffered an injury. To have done that, the government would have had to have offered a medical opinion that Kinrys had failed to provide care that met the applicable medical standards and that the breach of the duty of care was the cause of an injury to the patient.

"F.   A Two-Level Increase for Organizer, Leader, or Manager under U.S.S.G. § 3B1.1 is Appropriate."

Defendant has not objected to the two-level managerial role enhancement but nonetheless asks the Court to vary from it. Probation cites defendant pressing his employee Ania Zawadzka to write fake patient notes, which she did by finding model progress notes on the internet. PSR ¶121, Tr. 4/141. Ms. Zawadzka testified repeatedly that she was uncomfortable making up these records and felt that it was wrong. This made her uneasy. The evidence also shows, however, that she did not understand that these notes were being used to support fake claims. She was not involved in the billing and had only spoken to Yelena Barin once at the beginning of her time with Dr. Kinrys. When CMS investigators appeared at the Natick office in March 2017 to obtain patient records, Zawadzka realized that the notes were part of the wire fraud scheme and she quit a few days afterward. Perhaps she may be deemed to have had the requisite intent to make false medical records, but she was not party to the scheme.

Zawadzka's connection to the offense does not lead to the conclusion that Dr. Kinrys was managing a criminal enterprise with another participant. Thus, applying the enhancement here does not serve the intended purpose of the Guideline in punishing a leader of an organization. This was not an organization any more than a defendant hiring outside transportation companies or other service for a criminal scheme. These people may be uncomfortable with the defendant but do not have enough knowledge to be complicit in the crime. As soon as Zawadzka knew that her fake records had been used to cover up a billing scheme, she quit. Kinrys never sought to

pay Zawadzka a portion of fraud proceeds.  She was an ordinary employee and not a true participant in the sense of an unindicted coconspirator.

III. Government's APPLICATION OF THE GUIDELINES AND SECTION 3553(a) FACTORS

"<u>A. The Nature, Circumstances, and Seriousness of Kinrys' Offenses Justify a Significant Sentence of Incarceration</u> "

Defendant refers to this reply in II E above concerning the vulnerable victim enhancement.  The fact that a patient might not have received as many treatments as the patient expected does not mean that Dr. Kinrys failed to provide appropriate care.  Nor can the government argue that the defendant did not spend long hours caring for his patients.   This government argument fails for want to competent medical opinion proof.

The government advances a narrative that Dr. Kinrys' fraud was different from other fraud cases in its duration and persistence.  That is not so.  This case is much like any embezzlement case where the defendant continues for years until detected.  There are many examples.  The bookkeeper continues until the company president notices that company financials do not jibe with expenses and receipts.  Or the office cash box is always short but no one investigates why.   Like many other embezzlement cases, the defendant continues for years until caught. Dr. Kinrys did his own billing and he inflated his bills to charge for things he never did.  The defendant continued in his scheme until he was caught, then panicked and tried to cover up.  What is striking is only that he was not caught much sooner.

The government also argues that more punishment is justified because this is a health care fraud.  "Kinrys exploited the vulnerabilities in the trust-based health insurance system for his own financial benefit. By doing so, he contributed to a societal harm. The Court's sentence should take that harm into account." *Government's Sealed Sentencing Memorandum*, p. 23.  This

case is little different from any other fraud case in that the crime drives a societal need for greater enforcement and associated costs. The government is wrong to suggest that health care fraud crimes have damaged a "trust-based" system here. Health care insurance billing is anything but "a trust-based" system. Doctors and hospitals on the one hand and insurance carriers on the other have an adversarial business relationship. There is widespread criticism of private carriers for excessive denials of claims on routine health care procedures. The Kaiser Family Foundation conducted an analysis of 2021 CMS data on claims denials and appeals by 230 major medical issuers in HealthCare.gov, 17% of all in-network claims were denied on average with some plans reporting as high as an 80% denial rate.[2] The "providers" have a tense relationship with health insurance carriers over the complexity and cost of billing procedures. As December 2020 report of the American Hospital Association explained,

> [a] survey of more than 1,000 physicians found that more than 90 percent of respondents said prior authorization "had a significant or somewhat negative clinical impact, with 28 percent reporting that prior authorization had led to a serious adverse event such as a death, hospitalization, disability or permanent bodily damage, or other life-threatening event for a patient in their care.

Addressing Commercial Health Plan Abuses to Ensure Fair Coverage for Patients and Providers, AHA, December 2020.[3] "Physicians report that their offices spend on average two business days of the week dealing with prior authorization requests, with 86% rating the burden level as high or extremely high." *Id.*

"B.   Kinrys' History and Characteristics Provide No Explanation or Justification for His Criminal Conduct"

The government's brief acknowledges Dr. Kinrys' societal contributions but damns with faint praise. Dr. Kinrys has made decades-long contributions to advancing the medical sciences

---

[2] https://www.kff.org/private-insurance/issue-brief/claims-denials-and-appeals-in-aca-marketplace-plans/
[3] https://www.aha.org/system/files/media/file/2020/12/addressing-commercial-health-plan-abuses-ensure-fair-coverage-patients-providers.pdf

and to providing mental health care. It is because of physicians like Dr. Kinrys who both treat and publish that mental health has made great advancements. Forty years ago, the objective was to treat the mentally ill so that they could avoid institutionalization. Today, patients suffering from severe mood disorders or auditory hallucinations can lead full lives and even assume leadership roles. These are the subjects on which Dr. Kinrys has published and brought into patient treatment like the use of novel pharmaceutical agents.

Of course, Dr. Kinrys' life work does not square at with his reckless fraud crimes. But the Court's, counsel's and the government's deep dismay over such criminal conduct in this defendant should not lead to the irony of punishing Dr. Kinrys more harshly because of those achievements. See, Sealed Sentencing Memorandum, p. 25 ("In some ways, those achievements make Kinrys' criminal conduct worse.")

Likewise, the fact that Dr. Kinrys did not need the money he stole does not distinguish this case. Nearly every fraud defendant acts out of greed and other motives that cannot be closely discerned. They do not act out of need.

"C. The Need for General Deterrence and the Need to Promote Respect for the Law Calls for a Significant Term of Incarceration "

There is always a need for public deterrence. What distinguishes this case is that any sentence imposed here will have a deterrent effect on doctors and hospitals submitting false claims. The Court should have no doubt that Dr. Kinrys former colleagues are watching this case closely. His MGH colleagues will not comment or write and are keenly aware of this prosecution. (Also, Dr. Kinrys reports that they were subpoenaed by prior counsel for trial with little if any warning.) The results of this case will spread by word of mouth and likely cause other doctors not to let their relationship with insurers influence their billing practices.

## "D. The Need to Avoid Unwarranted Sentence Disparities Among Defendants Guilty of Similar Conduct"

The JSIN average sentence over the last five years for the 51 defendants in TOL 35/CHC III fraud cases is 97 months (96-month median). There is nothing to show that Dr. Kinrys' case is more serious. To the contrary, the victim impact is probably much lower in this case than the 51 others, unless a significant portion of these defendants were able to repay their victims like Dr. Kinrys will.

Varying downward from GSR and the JSIN average will not produce a disparate result. One important consideration here is that Dr. Kinrys' TOL contains a three-level trial penalty. If a major portion of the TOL 35/CHC III fraud defendants pled guilty, then the offense conduct was probably more extensive than defendant's.

LIST OF JEWELRY

Defendant objects to the list of jewelry appended to the government's memorandum. He has not been given opportunity to test it, even if there are some references in discovery to jewelry seized.

Dated: June 4, 2024

Respectfully Submitted,
Gustavo Kinrys, defendant,
By his counsel,
/s/Kevin L. Barron
P.O. Box 290533
Charlestown, MA 02129
(617) 407-6837

## CERTIFICATE OF SERVICE

Counsel certifies that he has caused a true copy of this memorandum to be served today on counsel for all the parties through the CM/ECF system of this District as set forth in the notice of electronic filing and that no party requires service by other means.

/s/Kevin L. Barron
Kevin L. Barron, Esq.